UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **CASE NO.** |
| **MCDANIEL COLLEGE, INC.,** | ) | |
| c/o Albert J. Mezzanotte, Jr., Statutory Agent | ) | |
| Whiteford, Taylor & Preston LLP | ) | |
| 7 St. Paul St. | ) | |
| Baltimore, MD 21202-1626 | ) | |
| | ) | |
| **Defendant.** | ) | |

**VERIFIED COMPLAINT FOR
INJUNCTIVE, DECLARATORY, AND MONETARY RELIEF**

**DEMAND FOR JURY TRIAL**

Plaintiff John Doe,[1] by and through counsel, for his Verified Complaint against McDaniel College, states as follows:

**INTRODUCTION**

1.     This action concerns the unjust decision of Defendant McDaniel College, Inc. (*"**McDaniel**"*) to suspend Plaintiff John Doe ("*John*") for at least one year for alleged sexual harassment and assault following a gender-biased, inquisitorial process that violated McDaniel's 2018-2019 Policy Against Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence (the "*Title IX Policy*" or "*Policy*"). The Title IX Policy is <u>Exhibit 1</u>.

2.     John, who has no criminal or disciplinary history, attended McDaniel with the help of a $140,000 ROTC scholarship. In addition to damaging John's otherwise unblemished reputation, McDaniel's unjust suspension, which resulted from multiple violations of the Title IX

---

[1] Simultaneous to the filing of this Verified Complaint, John Doe is filing a Motion to Proceed Under Pseudonym in order to protect the identities of all students referenced in pleadings and exhibits.

1

Policy and Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq.*

("*Title IX*"), has imperiled John's ROTC enrollment status. If John is disenrolled because of

McDaniel's Title IX ruling, which is the subject of a pending matter, he would be required to

repay the $140,000 scholarship and may be removed from the United States Army Reserves.

      3.     As it stands, the unjust Title IX ruling has already caused significant harm to John

as he remains only a Cadet within the Army Reserves and has lost job opportunities as his

security clearance remains pending. But for this Title IX ruling, John would have already been

commissioned as a Second Lieutenant with its increased salary, received his security clearance,

and been up for a promotion to First Lieutenant.

      4.     In September 2018, Jane Roe ("*Jane*") falsely accused John of two acts of non-

consensual sexual activity in crowded rooms, including one that allegedly lasted an hour. Jane

never filed a police report concerning these allegations. No eye witnesses, including Jane's

friends, corroborated these alleged public assaults. Further, multiple witnesses, including Jane's

former roommate, whom she had proffered as a friendly witness, testified that Jane had been

intoxicated on the evening in question, drinking stolen wine, slurring her speech, and even

hitting on her own cousin.

      5.     Despite this overwhelming evidence against Jane's credibility and claims, a panel

consisting of two McDaniel administrators, each with a demonstrated history of anti-male bias,

made biased credibility determinations, including stating that there was no evidence of Jane's

intoxication, reached factual conclusions that even McDaniel's investigator admitted had no

basis in the record, and ignored material evidence of John's innocence.

      6.     Even more disturbing, John was denied his promised advisor during this multi-

hour hearing and denied the opportunity to respond to Jane's baseless, end-of-hearing outburst

that McDaniel needed to find John responsible because he had sexually assaulted no less than three other women.

7.      John then appealed the panel's determination, which lacked the rationale required under the Title IX Policy, on three separate grounds. Despite this multi-pronged appeal, the appeal panel considered only one basis before rejecting John's appeal in its entirety. The appeal panel's decision was also riddled with errors and baseless credibility determinations, such as declaring that Jane's former roommate was unreliable because she and Jane did not get along, even though Jane had originally named her former roommate as a supporting witness.

8.      As more fully set forth below, this process violated Title IX by discriminating against John on the basis of his sex, materially breached McDaniel's obligations under the Title IX Policy, including the implied covenant of good faith and fair dealing, and, alternatively, violated promissory estoppel.

## PARTIES

9.      John is a resident of Maryland and a McDaniel graduate. He has never before been in trouble in his life. He serves his country in the Army Reserves and hopes to continue his career in the military.

10.     McDaniel is a private college with its principal place of business in Maryland.

11.     McDaniel has the authority to grant the injunctive relief sought in this Verified Complaint.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action: (i) under 28 U.S.C. §§ 1331 and 1343 because this action arises, in part, under the laws of the United

States, specifically Title IX; and (ii) pursuant to the principles of supplemental jurisdiction under 27 U.S.C. § 1367.

13.    This Court has personal jurisdiction over McDaniel as it is domiciled in and/or conducts business in the State of Maryland.

14.    This Court is authorized to grant the declaratory relief sought under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**I.  McDaniel Was Under Increasing Pressure from the U.S. Government, Students, and Their Families to Find Men Responsible for Title IX Violations in the 2010s**

16.    In the 2010s, McDaniel was facing increasing pressure from the U.S. government, students, and their families to crack down on alleged sexual assault and to find men responsible for alleged Title IX violations.

**A.  McDaniel Was Uniquely Susceptible to Pressure from the U.S. Government and Used this Pressure as an Excuse Before this Court to Justify Breaches of Its Title IX Policy**

17.    On April 11, 2011, the United States Department of Education's ("*USDOE*") Office of Civil Rights ("*OCR*") issued its now infamous "Dear Colleague Letter" to all colleges and universities on the investigation of sexual misconduct complaints under Title IX ("*Dear Colleague Letter*").[2] Three years later, on April 29, 2014, OCR issued its *Questions and Answers on Title IX and Sexual Violence* (the "*Q&A*").[3]

---

[2] DEAR COLLEAGUE LETTER, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (last visited June 13, 2020).
[3] QUESTIONS AND ANSWERS ON TITLE IX AND SEXUAL VIOLENCE, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (last visited June 13, 2020).

18.     In the Dear Colleague Letter and the Q&A, OCR required colleges and universities to implement specific Title IX processes and procedures on pain of losing millions of dollars in federal funding.

19.     McDaniel was uniquely susceptible to the Dear Colleague Letter's pressure, and before this very Court, argued that its desire to comply with the Dear Colleague Letter excused and justified its alleged violations of an earlier Title IX policy in *Naumov v. McDaniel Coll., Inc.*, Case No. 8:15-cv-00482-GJH (D. Md.).

20.     This Court, however, rejected McDaniel's reliance on the Dear Colleague Letter to excuse such violations, stating "to the extent the Dear Colleague Letter . . . was potentially inconsistent with its policy, the response by McDaniel upon receipt of the Dear Colleague Letter should have been to change their policy not to breach it when necessary." *Naumov v. McDaniel Coll., Inc.*, Case No. GJH-15-482, 2017 U.S. Dist. LEXIS 49887 at *30 (D. Md. Mar. 31, 2017) (denying McDaniel summary judgment on breach of contract claim for violating its Title IX policy) ("*Naumov*").

21.     This Court further noted that McDaniel's reliance on the Dear Colleague Letter was misplaced, and that its conduct went above and beyond the Dear Colleague Letter, stating: "There are certainly clear statements of policy in the Dear Colleague Letter. . . . But the Court sees nothing in these provisions that requires the action taken by McDaniel here." *Id.* at *29.

22.     Ultimately, this Court declared that, with regard to McDaniel, "[i]t is possible for an institution or individual to seek to do the right thing, motivated by proper motives and, yet, do so in the wrong way." *Id.* at *1.

23.     Indeed, barely one year before this Court's *Naumov* decision, McDaniel publicly prided itself on exceeding federal guidelines, with its Title IX Coordinator, Jennifer Glennon

("***Glennon***"), stating that, at least when it came to mandatory reporting: "We have gone beyond what is required by the Department of Education(DOE)/Office of Civil Rights (OCR) to define *all McDaniel employees* as responsible for reporting incidents."[4]

24.     On September 22, 2017, OCR rescinded the Dear Colleague Letter and the Q&A, stating that these documents, on which McDaniel so heavily relied, placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and that, as a result, many schools had established misconduct procedures that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."[5]

25.     At the same time it rescinded the Dear Colleague Letter and the Q&A, OCR issued interim guidance that specifically warned schools against biased processes based upon sex stereotypes, stating "[s]chools are cautioned to avoid conflicts of interests and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication. Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially."[6]

26.     Despite the Dear Colleague Letter's rescission, many colleges and universities continue to enforce its policies and still act under its influence, including, upon information and belief, McDaniel.

---

[4] Stefan Specian, *Title IX Policy Changes Confuse and Worry McDaniel Community*, THE MCDANIEL FREE PRESS (Feb. 10, 2016), http://www.mcdanielfreepress.com/2016/02/10/title-ix-policy-changes-confuse-and-worry-mcdaniel-community/ (Emphasis in original).
[5] RECISSION OF DEAR COLLEAGUE LETTER AND Q&A, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf (last visited June 13, 2020), at p. 1.
[6] SEPTEMBER 2017 Q&A ON CAMPUS SEXUAL MISCONDUCT, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf (last visited June 13, 2020), at p. 5.

### B. McDaniel Faced Increasing Pressure from Students to Punish Men for Alleged Sexual Misconduct

27.     In addition to facing governmental pressure, and using it as an excuse for potential policy violations, McDaniel was also subject to increasing pressure from students and their families to punish men under Title IX.

28.     In 2018, Cathy Orzolek-Kronner ("*Orzolek-Kronner*") helped three female students found a new student group on McDaniel's campus, Consent and Sexual Education, otherwise known as "*C.A.S.E.*"

29.     As Ozolek-Kronner told McDaniel's student newspaper in April 2019, she helped create C.A.S.E. because of a perceived lack of awareness of "healthy masculinity" on campus.[7]

30.     During the 2018-2019 academic year, C.A.S.E., with the recommendation of no less than three faculty members, including, upon information and belief, Orzolek-Kronner, applied for and received McDaniel's Griswold-Zepp Award, which is a grant of up to $3,000.

31.     Upon information and belief, the faculty recommendations for C.A.S.E. to receive the Griswold-Zepp Award, including those of Orzolek-Kronner, contained statements based upon anti-male stereotypes.

32.     Although McDaniel's website for the Griswold-Zepp award stated that C.A.S.E. intended to use the award to "support victims during the reporting and healing process," the photograph accompanying this award description showed that C.A.S.E.'s true intent was vengeance upon men.

---

[7] Atticus Rice, *Take Back the Night Walk a Moving Success*, THE MCDANIEL FREE PRESS (Apr. 17, 2019), http://www.mcdanielfreepress.com/2019/04/17/take-back-the-night-walk-a-moving-success/

33.     Specifically, the photograph, which is below, shows the three female students who formed C.A.S.E., with Orzolek-Kronner's help, holding posters asking "When will MEN be PUNISHED for VIOLATING our BODIES?" and "Boys will be ~~Boys~~ What They Are Taught."[8]



34.     Around the same time Orzolek-Kronner was creating student groups to address issues concerning "healthy masculinity," McDaniel was also being publicly excoriated for its supposed failure to address the problem of male sexual assault.

35.     In an October 26, 2018 article, The McDaniel Free Press, McDaniel's student newspaper, noted that students were feeling increasingly uneasy on campus because, in addition to the "recent allegations against Brett Kavanaugh and the continued surge of the #MeToo Movement," McDaniel's 2018 Clery Report showed an increase in sexual assault.[9]

36.     The article further detailed how McDaniel was failing to sufficiently punish male perpetrators of sexual assault, and included a story from a female student alleging that, even though her male assailant had been reported to campus police and found "guilty of multiple counts of sexual assault, campus authorities merely placed him on probation." *Id.*

---

[8] GRISWOLD-ZEPP AWARD, https://www.mcdaniel.edu/academics/career-services-experiential-opportunities/volunteer-opportunities/griswold-zepp-award#:~:text=With%20the%20Griswold%2DZepp%20Award,Term%2C%20or%20the%20summer%20months. (last visited June 13, 2020).

[9] Marya Kuratova, *Clery Report Reveals Rise in Reported Sexual Violence Crimes*, THE MCDANIEL FREE PRESS (Oct. 26, 2018), http://www.mcdanielfreepress.com/2018/10/26/clery-report-reveals-rise-in-reported-sexual-violence-crimes/ (last visited June 13, 2020).

37.     The article also discussed how in September 2018, families were demanding that McDaniel identify those "assaulting the McDaniel girls," and that McDaniel was censoring Facebook posts accusing McDaniel of failing to address the scourge of male sexual assault. *Id.*

38.     Upon information and belief, around this same time, McDaniel became involved in the Bringing Respect and Advocacy for Violence-free Environments ("BRAVE") Consortium to develop Title IX policies and procedures based upon anti-male stereotypes.[10]

## C. McDaniel Also Empowered Administrators with Public Anti-Male Statements to Serve as Adjudicators in Title IX Proceedings

39.     While McDaniel was facing this external pressure to find men responsible for sexual assault, McDaniel also empowered faculty with public anti-male statements to serve as adjudicators in Title IX proceedings.

40.     For example, as further discussed *infra*, McDaniel permitted Suzanne Nida ("*Nida*"), an English professor, to serve as a Title IX adjudicator despite her having a public Twitter account filled with anti-male statements.

41.     Nida's public anti-male Twitter statements include, but are not limited to:

- On November 16, 2017, a retweet in response to allegations of sexual assault by male politicians, stating: "And it's time for women to take over . . . I #believewomen."

- On September 20, 2018, publicly agreeing with statements that KellyAnne Conway, a counselor to the President, was a "disgrace to women," a "traitor to women," and an "affront to our gender" because she was not sufficiently "on the side of assault victims."

- On September 22, 2018, a tweet to the President opining on the reasonableness of fear experienced by young women, stating: "Shows how much you know about being a young female in such a frightening situation. But then again, how could you? Katie Johnson and her rape come to mind — *you didn't care about *her* fear.*

---

[10] BRAVE CONSORTIUM, https://baltimorecollegetown.org/about-us/communities-of-practice/brave/index.html (last visited June 13, 2020).

42.     Upon information and belief, Nida has made other anti-male statements both on and off social media, and screenshots of above-referenced posts, which are still visible to date, are Exhibit 2.

43.     Upon information and belief, McDaniel was either aware of Nida's anti-male statements or failed to conduct a basic review of Nida's public anti-male statements before empowering her to serve as a Title IX adjudicator.

44.     Upon information and belief, McDaniel was either aware of other anti-male statements from Title IX adjudicators, including Orzolek-Kronner, or failed to conduct a basic review of their public anti-male statements before appointing them as Title IX adjudicators.

45.     Upon information and belief, McDaniel's training for Title IX adjudicators was based upon anti-male stereotypes and did not include any training on anti-male biases.

**D. In November 2018, USDOE Proposed New Rules to Guarantee Impartial and Fair Title IX Proceedings that were Adopted in May 2020**

46.     In November 2018, USDOE put colleges and universities, including McDaniel, on notice that it was developing new rules to guarantee fair and impartial Title IX proceedings.

47.     In the proposed regulations, USDOE warned that colleges and universities would need to fill the positions of Title IX "coordinators, investigators, and decision-makers" with "individuals free from bias or conflicts of interest." 83 Fed. Reg. 61462, 61473 (Nov. 29, 2018).

48.     Further, the new rules would require all investigators and decision makers to objectively view all evidence and that the evaluation of such evidence could not be based "on the person's status as a complainant, respondent, or witness." *Id.*

49.     The proposed regulations also warned that schools would need to "use training materials that promote impartial investigations and adjudications **and that do not rely on sex**

**stereotypes**, so as to avoid training that would cause the grievance process to favor one side or the other or bias outcomes in favor of complainants or respondents." *Id.* (Emphasis added).

50.     These proposed regulations became final on May 19, 2020. 85 Fed. Reg. 30026 (May 19, 2020) (to be codified at 34 C.F.R. Part 106).

51.     In the final rules, which go into effect on August 14, 2020, the USDOE required that, for a fair Title IX process to take place, schools had to, among other acts:

- Presume the innocence, or non-responsibility, of a respondent. *Id.* at 30575.

- Prohibit the use of Title IX coordinators, investigators, or decision-makers who have conflicts of interest or bias against complainants or respondents, generally, or against an individual complainant or respondent. *Id.*

- Provide training to all Title IX personnel on "how to serve impartially and avoid prejudgment of the facts at issue, conflicts of interest, and bias, and that materials used in such training avoid sex stereotypes." *Id.* at 30084, 30575.

- Publicly publish their Title IX training materials on their website. *Id.* at 30578.

- Prohibit credibility determinations based upon a person's status as a complainant, respondent, or witness. *Id.* at 30575.

- Provide the parties and their advisors all of the evidence, including inculpatory and exculpatory evidence, as well as the investigative report, either electronically or in hard copy at least 10 days prior to a hearing or prior to the due date for a written response. *Id.* at 30576-77.

- Provide the parties live hearings with cross-examination conducted "directly, orally, and in real time," by the party's advisor, instead of through written questions. *Id.* at 30577.

52.     McDaniel's Title IX process, however, fell far short of the requirements for a fair Title IX proceeding.

**II. McDaniel's Title IX Policy Promised a Fair and Impartial Process**

53.     The Title IX Policy promised students a process that "will be prompt, fair and impartial from the investigation to the final result," and an investigation "designed to provide a fair and reliable gathering of the facts." Policy at 20, 22.

54.     Per the Policy, both the complainant and respondent had "the right to be assisted by an advisor of their choice through the process." *Id.* at 22.

55.     The advisor could "not be a witness or other party in the proceeding," and could not speak, ask, or answer questions during any proceeding. *Id.*

56.     The Policy provided conflicting information as to whether the respondent could have the advice of counsel.

57.     Although the Policy, in one section, stated that "an attorney may serve in the advisor role," in another, the Policy stated that McDaniel's Title IX process is "not considered legal proceedings" and forbade "formal legal representation." *Id* at 22, 35.

58.     It is unclear how a college student in their early 20s could understand their ability to have an attorney as an advisor, while simultaneously being denied legal representation.

59.     These limitations on who may serve as an advisor, or, at the very least, McDaniel's intentionally confusing directives about the use of an attorney, violate the 2013 Amendments to the Violence Against Women Act. *See* 20 U.S.C. § 1092(f)(8)(B)(iv)(II) (requiring university to provide both the accuser and the accused, "the same opportunities to have others present during an institutional disciplinary proceeding, ***including the opportunity to be accompanied to any related meeting or proceeding by an advisor of their choice.***") (Emphasis added).

12

**A. McDaniel's Investigative Procedures**

60.    McDaniel's Title IX process begins with a complaint concerning allegations that may violate the Policy.

61.    The Policy prohibits "sexual assault," which is an offense that meets a variety of defined terms, including "fondling." Under the Policy, "fondling" means "the touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the complainant . . ." *Id.* at 8-9.

62.    The Policy also prohibits "sexual harassment," which is defined as "unwelcome conduct of a sexual nature." *Id.* at 9. Examples of sexual harassment includes "physical conduct of a sexual nature." *Id.*

63.    In the event a complaint is received, it will be assessed and McDaniel will decide whether to start an investigation. *Id.* at 20-21.

64.    According to the Title IX Policy, students are instructed to "see Section IV for a review of the factors to be considered in pursuing an investigation." *Id.* at 24.

65.    Section IV of the Title IX Policy, however, does not contain any factors "to be considered in pursing an investigation," and, instead, is an instructional section on how to report incidents that may violate various McDaniel policies. *Id.* at 15-16.

66.    If McDaniel begins an investigation, whether pursuant to Section IV or another "variety of factors," then McDaniel must give the respondent notice. *Id.* at 21.

67.    McDaniel then designates one or two investigators, who "must be impartial and free of any conflict of interest," to gather evidence. *Id.* at 23.

68.    During this process, the parties may identify relevant evidence and witnesses, and provide, if they wish, proposed questions. *Id.*

13

69.   Despite the parties' participation in this process, the investigator is still obligated to "gather any available physical or medical evidence, including documents, communications between the parties, and other electronic records as appropriate." *Id.*

70.   At the investigation's conclusion, the investigator drafts an investigative report. This report is first viewed by the Title IX Coordinator or designee and then the parties are permitted to view it. *Id.* at 25.

71.   Per the Policy, the parties have only five calendar days to review and respond in writing to the report, which may consist of hundreds of pages, and they are not physically provided a copy of it. *Id.*

72.   Instead, the parties must schedule opportunities to review the report "in the Office of Human Resources or in a designated campus location." *Id.*

73.   Once the investigator's report is finalized, McDaniel, in consultation with the parties, will determine whether to adopt a "remedies-based resolution," such as mediation, or "formal resolution," which involves a disciplinary hearing process. *Id.* at 25-26.

**B. McDaniel's Procedures Prior to the Disciplinary Hearing**

74.   If a disciplinary hearing process is chosen, then the Title IX Coordinator or their designee populates a two-person decision panel "drawn from a pool of trained faculty and staff." *Id.* at 26 (the "***Decision Panel***").

75.   According to the Policy, all Decision Panel members must participate in an annual training coordinated by the Title IX Coordinator or their designee. *Id.* at 27.

76.   Although the mandatory annual training covers a variety of topics, none concern the issue of bias, and there is no statement that the training is not based upon sex stereotypes. *Id.*

77.     The parties are then notified of the time and place of the Decision Panel hearing, which the Policy refers to as a "Decision Panel meeting," at least five calendar days in advance, and the identities of the "2 chosen Decision Panel members." *Id.*

78.     The parties may then submit written objections to the Title IX Coordinator or designee within 24 hours as to the Decision Panel members for an alleged conflict. Thereafter, the Title IX Coordinator or designee must respond "to the objection in writing within 48 hours with a decision, and if necessary, include the name of the new panel member assigned to replace the removed member." *Id.*

79.     The Title IX Coordinator or designee then provides the Decision Panel and the parties access to the investigation report at least three business days prior to the hearing. *Id.*

80.     The parties, however, still are not provided a physical copy of the report and, instead, must view it at scheduled times in designated locations.

81.     The parties may request that individual witnesses who were previously interviewed be called before the Decision Panel. *Id.*

82.     The parties are also given the opportunity to prepare written questions in advance for the Decision Panel to ask of the investigator or witnesses, but the Decision Panel has discretion whether to ask any of these questions. *Id.*

**C. McDaniel's Disciplinary Hearing Procedures**

83.     During the "Decision Panel meetings" the Decision Panel members and the Title IX Coordinator or their designee are in a "meeting room" to meet with the witnesses and/or investigators.

84.     The Title IX Coordinator or designee is at the Decision Panel meeting "to serve as a resource for the members" on the Title IX Policy. *Id.* at 28.

15

85.     The parties are not permitted to be physically present in the Decision Panel meeting room except for when they are individually being interviewed. Instead, they are permitted to listen to the interviews "from a different room at the time that they are occurring." *Id.*

86.     The Title IX Policy makes no reference to the parties' abilities to ask or submit questions during the Decision Panel meetings.

87.     During the Decision Panel meeting, the parties may be accompanied by their advisor, but the advisor has no speaking role in the process, may not ask or answer questions, and may only provide advice to their advisee in a non-disruptive manner. *Id.* at 22.

88.     If a new witness that was not previously interviewed is discovered, then, per the Policy, the Decision Panel refers this new witness to the investigator, who incorporates their evidence into an updated report. *Id.* at 28.

89.     The Policy then states that the "updated report will be provided to the Decision Panel and the hearing will proceed as indicated below." *Id.*

90.     This above directive, however, appears to be a typo, as there are no hearing procedures "indicated below," as the Policy immediately jumps to the Decision Panel's deliberation procedures. *Id.*

### D. The Decision Panel's Deliberation Procedures and Outcome Letter

91.     The Decision Panel then deliberates and must render a final decision within two (2) business days of the final panel meeting. *Id.*

92.     The Title IX Coordinator or their designee will remain for these deliberations, but does not participate in them or vote. *Id.*

93.     The Decision Panel then is supposed to consider all of the "relevant facts derived from the completed investigation report and the interviews conducted during the panel meetings." *Id.* at 26.

94.     Although the Decision Panel is supposed to make a finding of responsibility based upon a "preponderance of the evidence" standard, the Policy does not include a presumption of innocence or non-responsibility for the respondent. *Id.* at 29.

95.     Also, per the Policy, while the "reporting party's prior sexual history is not relevant and will not be admitted as evidence in the resolution process," the Policy does not prohibit the Decision Panel from considering the respondent's prior sexual history as relevant evidence. *Id.* at 34.

96.     This provision is further proof of McDaniel's anti-male bias because women are statistically more likely to be the "reporting party" and men are statistically more likely to be the "respondent" in Title IX proceedings.

97.     There is no basis, other than anti-male discrimination, for McDaniel to exclude as irrelevant the prior sexual history of only one party to a Title IX proceeding.

98.     If the Decision Panel concludes that the respondent is responsible, it will "then determine appropriate sanctions." *Id.* at 29.

99.     In making any sanctions determination, the Decision Panel must engage in "a full consideration of the following factors: (1) The Respondent's prior discipline history (including any previous violations of the [Title IX Policy]); (2) how the College has sanctioned similar incidents in the past; (3) the nature and violence of the conduct at issue; (4) the impact of the conduct on the Complainant; (5) the impact of the conduct on the community, its members, or its property; (6) whether the Respondent has accepted responsibility for his/her actions; and (7) any

other mitigating or aggravating circumstances. Alcohol and drug use are not considered mitigating circumstances." *Id.*

100.    For any student who has been found responsible for "non-consensual sexual intercourse," only the most severe sanctions of suspension or expulsion are permissible. *Id.*

101.    For any student who has been found responsible for "non-consensual sexual contact or any other prohibited form of conduct," however, the potential sanctions vary wildly, from only a disciplinary warning, which the Policy lists as the least severe potential consequence, to expulsion, which is the most severe. *Id.* at 29-30.

102.    The Decision Panel must then reduce its decision to writing in an "outcome letter" and provide that letter to the parties. *Id.* at 32.

103.    Per the Policy, the "outcome letter" must contain the "findings of the decision panel" and "[t]he findings will detail the findings of fact and the basis/rationale for the decision of the panel, making reference to the evidence that led to the finding." *Id.* at 32.

104.    The Decision's Panel's decision, inclusive of both the finding of responsibility and the sanction, is "presumed to have been reasonable and appropriate." *Id.* at 33.

**E. McDaniel's Appeal Process**

105.    The Policy then describes McDaniel's appeal process.

106.    It appears, however, that there are typos littered throughout this section, with McDaniel interchangeably using the phrase "the appeal" with "the review."

107.    Once the parties receive the Decision Panel's outcome letter, then either party may appeal, although "[t]he review must be submitted via email to the Title IX Coordinator or designee within three business days of receiving the written outcome." *Id.* at 32.

108.    Under the Policy, the appellate panel is called the final review panel (the "***Final Review Panel***"), and it is a two-person panel comprised of two "Vice Presidents or designee appointed by the Title IX Coordinator." *Id.* The "Final Review Panel" is supposed to conduct the review in "an impartial manner." *Id*

109.    Per the Policy, "[t]he review shall consist of a concise and complete written statement stating the grounds for the review (see below) and all relevant information to substantiate the basis for the appeal." *Id.* at 32-33.

110.    Further, the "review request must state whether the individual is appealing the sanction, or both the sanction and the decision." *Id.* at 33.

111.    The only recognized grounds for final review are:

- The College significantly deviated from its stated procedures in such a way that materially affected the fairness of the hearing. Minor deviations from designated procedures will not form the basis for sustaining an appeal.

- The sanction(s) imposed is substantially disproportionate to the severity of the violation.

- Substantive new information that was not reasonably available at the time of the investigation has now become available and could considerably affect the outcome.

*Id.*

112.    The Title IX Coordinator or designee then reviews the "review request" to determine if it is "properly framed." If so, then the "review request" and any supporting documents are shared with the other party, who has three business days "to respond to the review documentation in writing to the Title IX Coordinator or designee." *Id.*

113.    The Final Review Panel must then render a written decision within five business days of receiving all appeal documents. *Id.* at 34.

114.    The Final Review Panel considers the matter with the burden on the "party requesting the final review," as the appellate panel presumes the "original determination . . . to have been reasonable and appropriate." *Id.* at 33.

115.    This is the only time in the Policy that McDaniel identifies anyone as having to bear a burden of proof.

116.    In its written decision, the Final Review Panel then:

- Accepts the decision of the decision panel,

- Amends the decision of the decision panel, or

- In the case of substantive new information, the Final Review Panel assesses the weight and impact of newly discovered information in light of the original decision and renders a decision.

*Id.*

117.    Although the Policy previously appears to differentiate between the "sanction and the decision," in one section, the Policy does not make any such distinction when discussing the Final Review Panel's authority to accept or amend "the decision," including when an appeal is based solely on the severity of the sanction. *Id.*

118.    Accordingly, under the Policy, the Decision Panel's "decision" also includes any imposed sanctions.

119.    The Final Review Panel's ruling is absolute and there are no further appeals. *Id.* at 34.

**III. On September 8 and 9, 2018, John and Jane Hung Out with a Large Group of Friends**

120.    In September 2018, John was a senior at McDaniel and in ROTC.

121.    On the afternoon of September 8, 2018, John was working on ROTC guard duty at a McDaniel football game. He was in uniform while on duty and did not drink any alcohol.

122.    After the football game, John hung out with some friends at the Alexander Apartments.

123.    In the early evening hours, John and several other students returned to John's apartment, which he shared with Student 1 and Student 2.

124.    The students who returned to John's apartment included Student 2, Student 3, and Student 4.

125.    Students 2, 3, and 4 were all in ROTC. Student 1 was not.

126.    While at John's apartment, Student 3, who was under 21, stole a bottle of wine belonging to Student 2.

127.    Later in the evening, John and several friends returned to the Alexander Apartments, where they ran into Jane.

128.    Jane was a freshman at McDaniel, under 21 years old, and in ROTC. She was also friends with Student 3.

129.    While at the Alexander Apartments, Jane and Student 3 drank the stolen wine.

130.    Jane's drinking at the Alexander Apartments was witnessed by others, including Student 3's roommate and fellow ROTC member, Student 5.

131.    John, Jane, and Students 1 through 4 then returned to John's apartment.

132.    The group crowded around to watch TV, and Jane, John, and Student 3 sat on a couch with John between the women.

133.    John draped his arm around Jane's shoulders as they watched a show, and, while his arm was draped, it touched her outer thigh.

134.    Nothing else occurred while Jane and John were on the couch in this crowded room.

135.    Jane then returned to her dorm room, where she and John texted about her desire to continue drinking and John having put his arm around her.

136.    Jane changed clothes and returned to John's apartment with alcohol that she had, against ROTC regulations, stored in her dorm room.

137.    When Jane returned to John's apartment, she drank the alcohol she had brought.

138.    Jane then sat next to John at his crowded kitchen table where a group of friends were talking. Others at the table included Students 1 through 4, Student 6, Graduate 1, and Graduate 1's girlfriend. Student 6 was in ROTC and Graduate 1, who had been in ROTC, was already a commissioned officer in the Army Reserves.

139.    While at the kitchen table, Jane used her left hand to grab John's right hand under the kitchen table. Several individuals at the table saw John and Jane holding hands under the table, including Students 1 and 2.

140.    Jane then left around 1:30 a.m. and returned to her dorm room.

141.    She and John continued to text with each other, and, after John initially expressed interest in Jane, he apologized because he did not want anything to be awkward between them as he was a senior in ROTC and she was only a freshman.

142.    Later on September 9, 2018, Jane retweeted about severe intoxication. The next day she also retweeted about being "touch deprived" and having physical relationships with men.

143.    On September 10, 2018, John heard from Student 5 that Jane was making unspecified claims about him.

144.    Without knowing what Jane was referring to, John texted her to apologize for any perceived wrongdoing and to avoid awkwardness between a senior and a freshman in ROTC.

**IV. McDaniel Began Title IX Proceedings Against John on September 13, 2018**

145.   On September 13, 2018, John was called into a meeting with Glennon about an alleged Title IX violation.

146.   Following his meeting John received written notice that, on September 8 and 9, he may have engaged in acts against Jane that constituted "sexual harassment" and "sexual assault / fondling" under the Title IX Policy.

147.   Although the notice did not include any factual allegations, John would later learn that Jane had claimed he had committed two assaults in front of multiple people at his apartment.

148.   First, Jane claimed that, while she was sitting next to John on the couch in the crowded TV room, he had slid his hands under her shorts and grabbed her butt for one hour. She also claimed that, while still sitting next to each other in the crowded room, John had lifted her shirt and cupped her breast. Jane alleged that she did not move because she was afraid of John.

149.   Next, Jane claimed that, after she had left and returned to John's apartment, John had slid his hand under her shorts and touched her vagina over her underwear while they were sitting at the crowded kitchen table.

150.   None of these events occurred, and no one witnessed them occur.

151.   On September 19, 2018, John, while not knowing the substance of the allegations against him, met with the assigned investigator, Campus Police Officer Sarah Cabassa ("*Investigator Cabassa*"), and gave his statement.

152.   Although Investigator Cabassa met with John's proposed witnesses, it is John's understanding that Investigator Cabassa did not request or review Jane's social media accounts, which would have revealed her tweets about intoxication and complicated physical relations with men.

153.    Although John reviewed Investigator Cabassa's report, he was able to do so only in specified locations on campus in the presence of McDaniel staff. He was never given a copy of the report to keep and review.

**V. McDaniel Informed John It Would Proceed with a Formal Disciplinary Hearing**

154.    On October 25, 2018, John received an email from Elizabeth Towle, McDaniel's Acting Dean of Student Affairs ("**Dean Towle**"), stating that a Decision Panel hearing would take place on November 9.

155.    On November 1, 2018, Dean Towle emailed John that Orzolek-Kronner and Nida would be serving on his Decision Panel.

156.    That same day, John objected to Orzolek-Kronner serving on the Decision Panel for anti-male bias.

157.    John did not object to Nida at that time because he was unaware of her multiple anti-male social media posts, including her September 20, 2018 support for the statements that a woman who was supposedly not "on the side of assault victims" was a "disgrace to women," a "traitor to women," and an "affront to our gender."

158.    Rather than ruling on the John's objection within 48 hours, as required under the Policy, Dean Towle scheduled a meeting with John for November 5, 2018.

159.    At the November 5, 2018 meeting, Dean Towle pressured John to withdraw his objection to Orzolek-Kronner, stating that she could not be biased because of her unspecified training. Dean Towle also warned John that Orzolek-Kronner's removal would likely cause an unacceptable delay.

160.    Feeling pressured by Dean Towle, who would physically be at the Decision Panel hearing, John reluctantly withdrew his objection.

161.   At this meeting, John also asked Dean Towle for Graduate 1, who had been interviewed, to be called as a witness before the Decision Panel.

162.   On November 7, Dean Towle emailed John "to confirm" he had withdrawn his objection to Orzolek-Kronner and to identify the Decision Panel witnesses. Dean Towle's list did not include Graduate 1.

163.   In this correspondence, Dean Towle also notified John that the Decision Panel would meet at 1:00 p.m. on November 9.

164.   John replied to this email to confirm that Student 1, who was a witness, could serve as his advisor during the Decision Panel hearing.

165.   On November 8, Dean Towle wrote to John, with a copy to Glennon, confirming that Student 1 could serve as John's advisor once he had completed his testimony.

**VI. McDaniel Denied John His Promised Advisor at the Decision Panel Hearing**

166.   On November 9, the Decision Panel hearing commenced at 1:00 p.m. and Dean Towle was present.

167.   John was placed in a separate room from the Decision Panel and was only able to listen to the hearing.

168.   John was not able to ask any questions in real-time during the hearing. Instead, he had to write questions down and have them delivered to the Decision Panel, which was under no obligation to ask them.

169.   Student 1 gave his testimony around 2:00 or 2:30 p.m.

170.   Despite Dean Towle agreeing in writing to permit Student 1 to serve as John's advisor, Student 1 was instructed to immediately leave after his testimony.

171.    Because of this order, McDaniel prevented John from having his permitted and chosen advisor at the Decision Panel hearing, which continued for several more hours.

172.    During this time, John was alone, scared, hungry, and emotionally exhausted as he had to listen to baseless allegations that he had committed sexual assault.

173.    Jane was the penultimate person to testify. Upon information and belief, Jane had the benefit of her personal advisor in the Decision Panel room while testifying.

174.    John was the last person to testify at the hearing.

175.    As Student 1 had been prohibited from serving as John's advisor, despite Dean Towle's earlier promise, John had no one in the Decision Panel room to support him as he gave his testimony.

176.    After John completed his testimony, the Decision Panel asked John and Jane, who was in another room with a speaker system, if they had any questions.

177.    At this point, Jane launched into a baseless attack against John before the Decision Panel.

178.    Jane claimed to the Decision Panel that John needed to be found responsible because he had sexually assaulted no less than three other named women.

179.    John asked for an opportunity to respond to these meritless and inflammatory allegations about his sexual history, but the Decision Panel denied his request.

180.    Upon information and belief, Jane's unchallenged outburst about his prior sexual history was considered and relied upon by the Decision Panel, particularly as its consideration was not prohibited by the Policy.

181.    When John finally left the Decision Panel meeting it was pitch black outside and he was finally able to eat dinner.

**VII.    The Decision Panel Suspended John on November 11, 2018**

182.    On November 11, the Decision Panel issued its outcome letter finding John responsible for both sexual harassment and sexual assault / fondling under the Policy (the "*Outcome Letter*").

183.    Despite having a wide array of potential sanctions at its disposal, including nothing more than a disciplinary warning, the Decision Panel immediately suspended John for one year and prohibited him from reapplying to McDaniel until he completed an off-campus counseling assessment.

184.    The Outcome Letter did not contain any rationale for imposing this severe sanction.

185.    To the extent the Outcome Letter contained any rationale, it was limited solely to the determination of responsibility.

186.    The Decision Panel's listed rationale, however, was inconsistent and pretextual, and often had no basis in the record.

187.    For example, the Outcome Letter held that there was little to no evidence that Jane had been intoxicated, despite the testimony of multiple eye witnesses, and accepted at face value Jane's claim that she returned to John's apartment with alcohol solely because she saw it as an opportunity to remove a few liquor bottles from her room.

188.    At no point did the Decision Panel, while finding that Jane was reasonably too afraid to move off the couch, address the fact that Jane had voluntarily returned to John's apartment with alcohol shortly after the allegedly first, hour-long assault.

189.   Likewise, the Outcome Letter held that John had been intoxicated that evening because of his supposed admission that he had been drinking at the football game. This was the very first finding of fact in the Outcome Letter.

190.   John, however, never drank at the football game (as he was in uniform on guard duty) and he did not admit to doing so. Instead, the Decision Panel, on its own, came to this baseless conclusion because John was a male at a football game.

191.   The Decision Panel members also rejected the credibility of every single one of John's proposed witnesses, i.e. every person who was in the room when the alleged assaults occurred, on pretextual bases, such as their membership in ROTC (of which Jane was a member), the slightest errors in memory (which Jane also had throughout the hearing), or the consumption of any alcohol (which Jane did as well).

192.   Only after John received the Outcome Letter did he tell his parents about this Title IX matter.

**VIII.   John Appealed the Outcome Letter on Three Grounds**

193.   After John received the Outcome Letter, he and his parents met with Glennon and Dean Towle about his appeal.

194.   At this meeting, John and his parents were told that the appeal had to come from John and that he could not have help with it.

195.   John and his family understood this order to be a prohibition on working with an attorney.

196.   Around this time, John and his family also reviewed the written evidence in front of Investigator Cabassa in a designated campus location.

197.     While talking with Investigator Cabassa, she admitted that the Decision Panel made conclusions that were not supported by her investigative report.

198.     John then drafted his appeal and timely submitted it.

199.     John's appeal stated that he was appealing both the findings of responsibility and the sanction imposed.

200.     John, as a young man in his early 20s without the assistance of counsel, appealed the Outcome Letter on three bases: for new evidence, for disproportionate sanctions, and for procedural error.

201.     At the top of his appeal, John stated that he was appealing for substantive new evidence.

202.     Just under this statement, however, John listed the "reasons for this appeal," and expressly included "severity of sanction" and the bias of the Decision Panel.

203.     For John's new evidence, he proposed additional testimony from Student 7, Jane's former roommate, who would testify that Jane had returned to her dorm room drunk.

204.     Jane had originally proposed Student 7 as a witness to Investigator Cabassa to verify her timeline.

205.     John's new evidence also included Student 8, who would confirm that John had not been drinking at the football game, and Student 9, who was Jane's cousin and who could confirm both her intoxication and that she had hit on him.

206.     For the other bases of the appeal, John alleged that the sanction was too severe, particularly given his lack of disciplinary history, and that the Decision Panel had not been fair and impartial as promised.

**IX. The Final Review Panel Considered Only One Appeal Basis and Affirmed the Suspension**

207.   On January 2, 2019, the Final Review Panel rejected John's appeal in its entirety, claiming that the appeal had been made only on the basis of new evidence.

208.   In addition to ignoring two of the three bases for John's appeal, the Final Review Panel's consideration of the new evidence was illogical and biased.

209.   For example, while agreeing that there was evidence that Jane had been visibly intoxicated, including slurring her speech, having an elevated mood, and making comments that her cousin was "cute," the Final Review Panel brushed aside all of this evidence claiming it did not mitigate John's actions.

210.   The Final Review Panel failed to even consider whether Jane's intoxication may have impacted her credibility about otherwise unwitnessed and uncorroborated events in crowded rooms.

211.   Likewise, the Final Review Panel discredited Student 7's statements about Jane's intoxication because they supposedly didn't get along, while ignoring the fact that Jane had first proposed Student 7 as a supportive witness.

212.   In its decision, the Final Review Panel ordered John to move out of his apartment with only five days' notice.

**X.  John's Suspension Has Caused Him Irreparable Harm**

213.   McDaniel's flawed and biased process violated both its unclear Policy and federal law.

214.   McDaniel's finding of responsibility and suspension, mere months before John was supposed to graduate, has severely and irreparably harmed his reputation and economic prospects.

215.    Although John reapplied to and graduated from McDaniel in December 2020, his life was put on hold for one year and McDaniel's Title IX decision still looms large over John's life.

216.    Because of McDaniel's Title IX decision, John has not yet received his commission as a Second Lieutenant in the United States Army Reserves and his security clearance remains pending.

217.    Instead, John has remained a Cadet within the Army Reserves, which is not paid as well as a Second Lieutenant, and, because he has not yet received his security clearance, he has lost myriad job opportunities.

218.    Additionally, had John become a Second Lieutenant on schedule, he would already be up for a promotion to First Lieutenant, with its commensurate pay raise.

219.    Aside from having prospective consequences, the Title IX ruling also threatens the $140,000 ROTC scholarship John received to attend McDaniel.

220.    In November 2019, John participated in a ROTC disenrollment hearing where the sole focus was John's alleged violation of the Title IX Policy.

221.    Although no decision has yet been reached, if John is disenrolled he will need to repay the $140,000 ROTC scholarship, and he may be removed from the Army Reserves.

**<u>CLAIM ONE</u>**
**(Breach of Contract and Implied Covenant of Good Faith and Fair Dealing)**

222.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

223.    The relationships between private colleges and their students is contractual and includes the university's policies relating to conduct and disciplinary proceedings. In determining whether a private university breached any provision of its educational contract, the

Court will determine whether the university's actions met the expectations of a reasonable person.

224.    The Title IX Policy is a binding contract between John and McDaniel.

225.    The Title IX Policy, as a contract, also contains an implied duty of good faith and fair dealing.

226.    McDaniel offered enrollment to John, and he accepted that offer and paid McDaniel tuition.

227.    John satisfied all of the obligations required by McDaniel to remain in good standing and enrolled at McDaniel, with the understanding and reasonable expectation that McDaniel would fulfill its contractual obligations to him.

228.    John satisfied all of the obligations required by McDaniel to remain in good standing and enrolled at McDaniel, with the understanding and reasonable expectation that McDaniel would act fairly and in good faith towards him.

229.    McDaniel materially breached its contractual obligations to John under the Title IX Policy, including the Policy's implied covenant of good faith and fair dealing, for all of the reasons above, including, but not limited to:

- McDaniel failing to appoint unbiased and impartial Decision Panel members, particularly in light of Nida and Orzolek-Kronner's public anti-male statements.

- McDaniel failing to adequately train its Title IX adjudicators to conduct unbiased and impartial Title IX proceedings.

- McDaniel failing to assess and consider the evidence in John's Title IX proceeding in an unbiased and impartial manner, including granting Jane greater credibility because she is a woman.

- McDaniel's investigator failing to request or consider Jane's social media posts, which contained information concerning Jane's intoxication and credibility.

- McDaniel failing to timely adjudicate John's objection to Orzolek-Kronner serving on the Decision Panel.

- McDaniel and Dean Towle impermissibly pressuring John to withdraw his objection to Orzolek-Kronner just days prior to the hearing.

- McDaniel impermissibly rejecting John's request for Graduate 1 to serve as a witness at his Decision Panel hearing.

- McDaniel impermissibly prohibiting Student 1 from serving as John's advisor at the Decision Panel hearing, after Dean Towle had permitted it in writing with a copy to Glennon, McDaniel's Title IX Coordinator.

- McDaniel impermissibly frustrating John's ability to use his choice of personal advisor, which is also required under federal law, at the hearing or on appeal.

- McDaniel's impermissibly denying John's request to respond to Jane's baseless accusations before the Decision Panel of his prior sexual history.

- McDaniel failing to include any rationale or findings for imposing the severe sanction of suspension, which prejudiced John's appeal rights, despite the Policy's requirement that the outcome letter contain such explanation.

- McDaniel making findings of fact that had no basis in the record as well as making biased and pretextual credibility determinations.

- McDaniel failing to consider or rule on all three bases of John's appeal.

- McDaniel's administrators impermissibly telling John he could not have the assistance of third-parties, including counsel serving as personal advisors, for his appeal, which also violated federal law.

230.    McDaniel also materially breached its contractual obligation to provide John a fair Title IX process for all of the above-mentioned reasons, as well as when:

- McDaniel denied John a presumption of innocence / non-responsibility.

- McDaniel prohibited the Decision Panel from considering Jane's prior sexual history, but allowed it to use John's alleged sexual history against him.

- McDaniel failed to train its Title IX adjudicators to consider all of the evidence without reliance on sex stereotypes.

- McDaniel failed to provide John with its training materials for Title IX adjudicators, despite Dean Towle claiming that such training guaranteed that its adjudicators could not be biased against him.

- McDaniel failed to provide John with an electronic or hard copy of the evidence for him to review outside of designated campus locations.

- McDaniel failed to provide John a live hearing with the ability to cross-examine witnesses in real time.

231.    As a direct and foreseeable consequence of the above material breaches of contract by McDaniel, John sustained damages, including, without limitation, loss of educational and career opportunities, economic injures, and other direct and consequential damages.

232.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus pre and post judgment interest and attorney fees and costs.

**CLAIM TWO**
**(In the alternative to Count One, Promissory Estoppel)**

233.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

234.    In the alternative to John's breach of contract claim, McDaniel's various standards, policies, and procedures, as well as its writings to John by authorized representatives, such as Dean Towle's promise that Student 1 could serve as John's personal advisor, constitute clear and definite promises to John that McDaniel reasonably believed would induce his action or forbearance.

235.    McDaniel reasonably expected John to accept McDaniel's offer of admission, incur tuition and fee expenses, and to choose not to attend other colleges based on its express and implied promises, including that McDaniel would provide John with a fundamentally fair process in a hearing, should he be accused of a violation of the applicable policies.

236.     McDaniel's promises induced actual and reasonable action and forbearance by John to his detriment, and this detriment can be avoided only by the enforcement of McDaniel's promises.

237.     As a direct, proximate and foreseeable consequence of the above-referenced conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed, and may include the loss of his commission as a Second Lieutenant in the Army Reserves as well as a $140,000 ROTC scholarship.

238.     John has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, loss of future career prospects, and other direct and consequential damages.

239.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## CLAIM THREE
### (Violation of Title IX – Erroneous Outcome)

240.     John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

241.     Title IX, 20 U.S.C. §§ 1681 *et seq.*, provides, in relevant part, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

242.     Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

243.    Title IX may be violated by an institution of higher education's imposition of discipline where gender is a motivating factor in the decision to discipline.

244.    Under Title IX's erroneous outcome theory, a plaintiff is innocent and wrongfully found responsible with gender bias as a motivating factor.

245.    An erroneous outcome occurred in John's case because he was found responsible for violating McDaniel's Title IX Policy, and gender bias was a motivating factor in the decision.

246.    For all of the reasons listed above, including those stated in Counts One and Two, John was subjected to a procedurally or otherwise flawed proceeding that led to an adverse and erroneous outcome.

247.    For all of the reasons listed above, including those stated in Counts One and Two, anti-male bias was a motivating factor in the erroneous outcome.

248.    The aforementioned reasons establishing McDaniel's anti-male bias include, but are not limited to:

- The public anti-male social media posts of Nida, one of John's Decision Panel members, announcing "I#believewomen," calling a woman who was purportedly not "on the side of assault victims" to be a "disgrace to women," a "traitor to women," and an "affront to our gender," and aligning herself with the alleged fear of young women, which was a central question of fact in John's case.

- The public anti-male statements of Orzolek-Kronner, one of John's Decision Panel members, stating that she helped found a student group, which publicly announced its desire to punish men, because of a perceived lack of awareness of "healthy masculinity" on campus.

- The Decision Panel made findings of fact that have no basis in the record, such as the first finding in the Outcome Letter that John had been drinking at the football game when he was, in reality, sober, in uniform, and on guard duty, and can be explained only as a result of anti-male bias.

- The Decision Panel denied John's request to respond to Jane's baseless outburst that he needed to be held responsible because he had committed no less than three previous acts of sexual assault.

- The Policy permitted the Decision Panel to consider John's alleged sexual history against him, but prohibited any consideration of Jane's sexual history.

- The aggregate procedural errors in John's Title IX proceeding alone are sufficient evidence of anti-male bias.

249.    Upon information and belief, McDaniel's training materials were also based upon anti-male sex stereotypes and McDaniel was aware of other anti-male statements from its Title IX adjudicators.

250.    McDaniel's conduct, as described above, also discriminated against John, on the basis of his sex, through discriminatory, gender-biased implementation of the Policy, in the context of pressure from OCR, the public, and the climate on McDaniel's campus.

251.    Further, McDaniel was uniquely susceptible to this pressure and even used it as an excuse before this Court in *Naumov* to excuse alleged breaches of its Title IX policies.

252.    McDaniel ignored evidence supporting John's version of events and undermining Jane's credibility and imposed a sanction on him that is likely to severely and irreparably harm him for life.

253.    The McDaniel officials involved appear simply to have chosen to believe Jane because she is a woman and to disbelieve John and his witnesses because he is a man.

254.    McDaniel has failed to remediate its discriminatory actions against John and he is now at risk of irreparable harm to his reputation, and his future educational and economic prospects.

255.    As a direct and proximate result of McDaniel's acts and omissions, John has suffered tremendous damages in an amount to be determined at trial, including the potential loss

of his commission in the Army Reserves and his $140,000 ROTC scholarship, loss of education and career opportunities, economic injuries, and other direct and consequential damages.

## CLAIM FOUR
### (Violation of Title IX – Selective Enforcement)

256.   John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

257.   In addition to providing for a private cause of action under a theory of erroneous outcome, Title IX also provides for a private cause of action under a theory of selective enforcement.

258.   Under Title IX's selective enforcement theory, regardless of the plaintiff's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the plaintiff's gender.

259.   Although John was innocent of the Title IX allegations levied against him, the severity of the penalty alone was directly attributable to anti-male bias.

260.   Under the Policy, an exceptionally wide range of potential sanctions could be imposed against John, ranging from the least severe sanction, a mere disciplinary warning, to the most severe sanctions of suspension and expulsion.

261.   Under the Policy, a sanction could be imposed only after the Decision Panel engaged in a full consideration of seven factors, including the plaintiff's lack of prior disciplinary history.

262.   Under the Policy, the Outcome Letter had to include findings of fact and the rationale for the sanction imposed.

263.   McDaniel failed to conduct a full consideration of all seven factors and failed to include its rationale for imposing suspension in the Outcome Letter.

264.     Further, for all of the reasons previously discussed, including those listed in
Counts One, Two, and Three, McDaniel's Title IX process was tainted with gender bias, the
Decision Panel members had a public history of anti-male statements, and McDaniel was
uniquely susceptible to outside anti-male pressure from the government and public.

265.     Upon information and belief, women at McDaniel found responsible for Title IX
Policy violations that did not involve "non-consensual intercourse" received less severe
sanctions than suspension.

266.     Upon information and belief, McDaniel possesses records evidencing that women
found responsible for Title IX Policy violations that did not involve "non-consensual
intercourse" received less severe sanctions than suspension.

267.     Further, McDaniel afforded greater deference and credibility to Jane because she
is a woman.

268.     As a direct and proximate result of McDaniel's acts and omissions, John has
suffered tremendous damages in an amount to be determined at trial, including the potential loss
of his commission in the Army Reserves and the loss of his $140,000 ROTC scholarship, loss of
education and career opportunities, economic injuries, and other direct and consequential
damages.

**WHEREFORE,** John respectfully requests that this Court:

(A)     Award compensatory and punitive damages in an amount to be determined at
        trial;

(B)     Enter injunctive relief that vacates the decision of McDaniel to suspend John for
        at least one year, and vacates and removes from his academic record all references
        to the suspension decision and any other related sanctions or disciplinary actions;

(C)     Issue a declaration that McDaniel's procedures under the Title IX Policy is
        unlawful;

(D)     Award court costs and other reasonable expenses incurred in maintaining this
        action, including reasonable attorney fees; and

(E)     Award such other relief as this Court may deem just and proper.

Dated: June 23, 2020                    Respectfully Submitted,


                                        /s/ Howard S. Stevens
                                        Howard S. Stevens, USDC MD Bar No. 25587
                                        /s/Meighan G. Burton
                                        Meighan G. Burton, USDC MD Bar No. 28022
                                        PASCALE STEVENS, LLC
                                        2700 Lighthouse Point East Suite 500
                                        Baltimore, MD 21224
                                        P: (443) 863-5762
                                        F: (443) 863-5751
                                        HStevens@pascalestevens.com
                                        MBurton@pascalestevens.com
                                        *Attorneys for Plaintiff*

                                        Susan C. Stone*
                                        Kristina W. Supler*
                                        Melissa A. Yasinow*
                                        KOHRMAN JACKSON & KRANTZ, LLP
                                        1375 E. 9th Street, 29th Floor
                                        Cleveland, OH 44114
                                        P: (216) 696-8700
                                        F: (216) 621-6536
                                        E: scs@kjk.com; kws@kjk.com; may@kjk.com

                                        *Applications for Special Admission – Pro
                                        Hac Vice to be submitted*

                                        *Counsel for Plaintiff John Doe*

41

## JURY DEMAND

Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 39.

*/s/ Howard S. Stevens*
Howard S. Stevens, USDC MD Bar No. 25587
*/s/Meighan G. Burton*
Meighan G. Burton, USDC MD Bar No. 28022

*/s/ Susan C. Stone*
Susan C. Stone*

*/s/ Kristina W. Supler*
Kristina W. Supler*

*/s/ Melissa A. Yasinow*
Melissa A. Yasinow*

*Applications for Special Admission – Pro
Hac Vice to be submitted*

## VERIFICATION

I,  being duly sworn, state that I have reviewed the factual allegations contained in this Verified Complaint. I am the John Doe described in the Complaint. I believe that the disclosure of my identify will cause me irreparable harm as this case involves matters of utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. §1232g, 34 CFR Part 99. All of the factual allegations in the Verified Complaint are true and accurate to the best of my knowledge.

Sworn to before me and subscribed in my presence this 19th day of June, 2020.

Carol C Gibson
_____
NOTARY PUBLIC

